# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 8, 2017

## JOSEPH ANTHONY SAITTA, JR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Warren County**
**No. F-13783    Larry B. Stanley, Jr., Judge**

**No. M2017-00081-CCA-R3-PC**

FILED

SEP 08 2017

Clerk of the Courts

The petitioner, Joseph Anthony Saitta, Jr., appeals the denial of post-conviction relief from his Warren County Circuit Court conviction for rape of a child. The petitioner alleges he received ineffective assistance of counsel and that the cumulative effect of trial counsel's errors resulted in the denial of a fair trial. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Susan N. Marttala, Assistant Public Defender, McMinnville, Tennessee, for the petitioner, Joseph Anthony Saitta, Jr..

Herbert H. Slatery III, Attorney General and Reporter; Alexander Collins Vey, Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Tom Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

A Warren County Circuit Court jury found the petitioner guilty of rape of a child, and the trial court subsequently imposed a sentence of fifty-eight years in confinement to be served at 100%. On direct appeal, this Court confirmed the petitioner's conviction, and our Supreme Court denied his application for permission to appeal. *State v. Joseph*

*Anthony Saitta, Jr.*, No. M2013-01947-CCA-R3-CD, 2014 WL 4384319 (Tenn. Crim. App. Sept. 5, 2014), *perm. app. denied* (Jan. 15, 2015). This Court previously recited the following underlying facts:

In July 2012, the Warren County Grand Jury indicted the [petitioner] for rape of a child. The alleged victim was his daughter, who was born on June 30, 2009.

At trial, Sethly Hodges testified that she became a licensed practical nurse in November 2010, began working for CareAll Home Health in April 2011, and was assigned to care for the victim from April to November 2011. The victim, who was two years old in November 2011, was Hodges's only patient. The victim suffered from cerebral palsy, brain damage, scoliosis, and breathing problems; had a feeding tube and tracheostomy; and could not speak. Hodges did not think the victim had clear vision, but the victim could hear. Hodges said that she and another nurse "split" the victim's care, each working twelve-hour shifts, and that she cared for the victim thirty-six to forty-six hours per week. The nurses looked after the victim in her home and "did everything" for her, including changing her diaper, sometimes washing her laundry, bathing her, flushing her feeding tube, and giving her breathing treatments. Usually, one of the victim's parents was present. Hodges said she never had to leave the victim alone with the victim's parents because another nurse always came in at the end of Hodges's shift and "relieved" her.

Hodges testified that at some point, the victim's family lost use of both of its vehicles. The nurses tried to help the family by driving the [petitioner] to work, and Hodges even let the family use her car to run errands. The victim's mother also had a five- or six-year-old son, but he did not live with the family. In November 2011, the victim's mother was scheduled to have visitation with her son for Thanksgiving. The victim's mother did not have transportation, so Hodges drove her to pick up the boy on Tuesday, November 22, 2011. The trip lasted about four hours. While Hodges and the victim's mother were gone, the victim was at home alone with the [petitioner]. Hodges said she was not worried about leaving the victim with the [petitioner] because the victim's mother was not concerned about it. Also, the victim had been left alone with the [petitioner] previously, and the [petitioner] knew how to take care of her. Before Hodges and the victim's mother left for the trip, Hodges checked the victim's diaper and flushed her "trach." The diaper did not need to be changed.

- 2 -

Hodges testified that while they were on the trip, the victim's mother received a text from the [petitioner], stating that the victim had had "a really big, hard bowel movement and he didn't think the nurses were giving her enough water that he was going to give her water." Hodges stated that she had never experienced the victim "being what I would call constipated. There maybe [had] been a day or two that she didn't have a bowel movement but that doesn't necessarily mean that she was constipated." Hodges said that the victim sometimes received Miralax or Benefiber in her feeding tube and that the victim's mother "would kind of switch her back and forth, Benefiber and Miralax and there was discussion that she may have been constipated but as far as when I was there I never saw any — nothing concerned me as far as constipation." Hodges had never seen blood in the victim's stool.

Hodges testified that when she and the victim's mother returned home about 4:30 p.m., she went into the victim's bedroom and immediately smelled the strong odor of a bowel movement. The [petitioner] was lying on the floor in the room but got up and went into the living room, and Hodges began changing the victim's diaper. She said that when she opened it, she noticed blood and "a little bit of discoloration as far as like a little bit of brown but it's not what I would call a bowel movement." Hodges said that she had been expecting a bowel movement in the diaper but that "[t]here was what appeared to be like BM, maybe almost looked like a little bit of diarrhea maybe. . . . [A]nd then there is like slimy stuff. It's all kind of mixed together." Upon seeing the blood, Hodges called for the victim's mother. When the victim's mother came into the room, she inspected the victim's rectum, and they saw that the victim's rectum had been "ripped." Hodges said that the rip was not "front to back" but that it was "a good size rip" and "shocking." Hodges wiped the victim's vagina with a baby wipe but saw no blood. When she wiped the victim's rectum, blood was on the wipe. She stated,

> I'm not going to say that it was oozing out but again, whenever she pulled her bottom apart you could see blood up inside of there kind of with the bodily fluids, there was tissue. I didn't just sit there and stare at it because it was very gut wrenching.

Hodges testified that the victim's mother's face "got red," that both of them were shaking, and that the victim's mother began yelling at the [petitioner].

- 3 -

The victim's mother went to speak with him, and Hodges could hear them "bickering back and forth." The victim's mother wanted to know about the blood and "how did your daughter's bottom get like this." The [petitioner] said he did not know.

Hodges testified that she was panicked, scared, and "thinking the worst." She stated, "I couldn't even, like as a nurse, looking back, I should have looked further at [the victim] but I have a two year old daughter and seeing that was very traumatic." Hodges wanted to telephone her supervisor but was afraid the [petitioner] would hear her and was afraid of what the [petitioner] might do. Therefore, she texted her supervisor about the situation. When her supervisor did not respond, Hodges texted Tracy Martin, the nurse who was supposed to relieve her from her shift. Martin responded that if the victim's condition was as bad as Hodges said, then she needed to take the victim to the hospital. Hodges talked with the victim's mother about taking the victim to the hospital, and the [petitioner] stated that if they did so "they're going to think [he] did it."

Hodges testified that she noticed the trash can by the victim's bed had been emptied and that she told the victim's mother that the diaper the [petitioner] had changed was not there. The victim's mother left the room and returned with the diaper. Hodges said the victim's mother also had paper towels with blood "all over them." They opened the diaper but saw no blood in it. Hodges said that "mushy" stool was in the diaper but that the amount of stool "wasn't huge" and that she saw nothing concerning about the stool. She said the bloody paper towels were "kind of pink in some places . . . slimy, if you will" and appeared to have bodily fluid on them. The State asked Hodges if she recognized the fluid, and she said that she thought it was semen. She said the nurses never used paper towels to clean the victim after a bowel movement. They always used baby wipes.

Hodges testified that she and the victim's mother decided to take the victim to the emergency room (ER) but did not let the [petitioner] know what they were doing. They put the diaper that Hodges had taken off the victim, the diaper that the [petitioner] had changed, and the bloody paper towels into a bag and put the bag in Hodges's purse. On the way to the hospital, Hodges and the victim's mother agreed to say the victim's condition occurred when Hodges "ran [the victim's mother] down to the Dollar General." Hodges said that when they arrived at the ER and spoke with the triage nurse, the victim's mother "was a completely different person" and told the nurse that the victim "had been dealing with some

- 4 -

constipation problems and that there was a little blood in her feces." Hodges said that the victim's mother's statement was "[a]bsolutely not" consistent with what Hodges had seen but that Hodges did not say anything to the triage nurse. She said that the victim's mother "didn't let me do a whole lot of talking" but that "I did try to stress the severity of the rip." The victim's mother did not tell the nurse about the bloody paper towels or the blood in the diaper that the [petitioner] had changed.

Hodges testified that her shift ended at 7:00 p.m. and that Martin arrived at the hospital to relieve her. Hodges spoke with Martin in the parking lot, "tried to stress to her the severity of the tears," and gave her the bag that contained the diapers and paper towels. Hodges said that when she got home, she telephoned the hospital, spoke with the nurse caring for the victim, and told the nurse that she thought "they should investigate further because [she] thought there was a little more going on that [the victim's] mother hadn't made them aware of." Hodges also began having second thoughts about lying to her supervisor regarding the amount of time she had been away from the victim that day. Hodges had told her supervisor that she and the victim's mother had gone to the store. Hodges said she did not tell her supervisor about the four-hour trip because she was afraid of losing her job and her nursing license. However, she decided "to come clean . . . for [the victim's] sake." The next morning, she went to CareAll and told her supervisor about the trip, and CareAll fired her. Hodges went to the sheriff's department and spoke with Investigator Kelly Carter.

On cross-examination, Hodges acknowledged that a laxative or fiber supplement was a routine part of the victim's care and that the victim had to have them. She also acknowledged that the victim's physician had prescribed Miralax or Benefiber to the victim and had switched the victim from one to the other. At the time of this incident, the physician had switched the victim back to Benefiber. The [petitioner] had very little to do with the victim. In fact, neither of the victim's parents had much to do with her care because the nurses always took care of her. During the four-hour trip, Hodges and the victim's mother stopped at the home of Hodges's boyfriend in Smithfield to get money for gas. When they returned to the victim's mother's home after the trip, Hodges saw blood in the victim's diaper. Defense counsel asked Hodges about the amount of blood, and she stated, "I mean it wasn't just like covered in blood but there was spots of blood, smears of blood."

-5-

Hodges acknowledged that as part of her duties, she made notes about the victim throughout her shifts. On November 22, 2011, Hodges made her notes after she left the ER. Defense counsel showed Hodges her notes, and she acknowledged that she wrote that blood "'appear[ed]'" to be in the victim's diaper. She said she was sure she saw blood. She acknowledged that a child could have a large bowel movement with blood in the stool. She described the tear to the victim's rectum as large and "straight up and down" but said, "I looked away from it to be completely honest because it startled me." The paper towels were not saturated with blood, but "there was a lot of smeared blood on them." The blood appeared to be mixed with semen but Hodges could not say for sure whether the fluid was semen or some other bodily fluid. Defense counsel asked why she thought the fluid was semen, and she stated, "I guess because she was torn and that's the first thing that entered my mind." She acknowledged that although she was scared for the victim on November 22, she did not show the diapers or paper towels to the hospital staff. She said that she regretted that decision every day and that she and the victim's mother thought the [petitioner] had done something to the victim. Hodges acknowledged that the ER physician diagnosed the victim with constipation. Hodges said she thought the hospital staff "didn't check her out thoroughly because they weren't led in the right direction to check her out thoroughly." She acknowledged that she did not know the [petitioner] harmed the victim.

On redirect examination, Hodges testified that what she saw in the diaper did not match the [petitioner's] description in his text message. She acknowledged that, given the physician's diagnosis of constipation, she could have decided not to reveal anything to her CareAll supervisor. However, she stated,

> As a human being I felt like – and also I have a daughter that is the same age and seeing [the victim] the way that I saw her in the condition that she's in it was horrifying and I truly felt like I had to go further with it for [the victim's] sake. Yes, I didn't feel that he went far enough as investigating what was wrong with her.

Tracy Martin testified that she became a licensed practical nurse in June 2005 and was involved in the victim's care through CareAll from June or July 2011 until November 22, 2011. The victim could not communicate, sit, or roll over but responded to loud noises. When the victim was in pain, she was fidgety, moved her arms, and sometimes produced tears from her

- 6 -

eyes. Martin spent at least thirty-six hours per week with the victim, usually working twelve-hour shifts, and her care of the victim included respiratory treatments, rotating splints on the victim's hands and feet, exercising, bathing, and administering medications. The victim's parents also knew how to care for the victim and changed the victim's trach tube, which the nurses were not authorized to do. The victim's mother was very active in her care and instructed the nurses. The [petitioner] changed the victim's trach when it needed to be changed, but Martin did not see him often and did not have much interaction with him. Besides Martin and Sethly Hodges, other nurses also provided care for the victim.

Martin testified that on November 22, 2011, she was supposed to care for the victim from 7:00 p.m. to 1:00 a.m., which was a short shift. About 5:00 p.m., Hodges texted Martin that she was scared something had happened to the victim. Hodges later telephoned Martin and told her what was happening. Martin told Hodges to notify CareAll and take the victim to the ER if Hodges had any question about the victim's condition. Martin thought CareAll told Hodges to take the victim to the ER, and Martin reported to the ER for duty.

Martin testified that when she arrived at the hospital, the victim, the victim's mother, the [petitioner], and Hodges were sitting in the waiting room. The victim's mother asked Martin to drive the [petitioner] to work, so Martin drove him to Calsonic. During the drive, the [petitioner] asked Hodges if constipation could have caused the victim's "problems." He also told Martin to tell the victim's mother "that constipation causes that." Martin said she thought the [petitioner's] statements were "very odd." When she returned to the ER, the victim and the victim's mother were still in the waiting room. Hodges and Martin went to get some things out of Hodges's car, and Hodges reported to Martin what had happened. While Hodges and Martin were outside, the victim's mother texted or telephoned Martin, asked what they were doing, and told Martin that she needed to get back inside. Martin took the victim's car seat out of Hodges's car, and Hodges gave her a white plastic bag containing diapers and paper towels. Hodges told Martin that the items in the bag were from the victim and that Martin needed to take them. Martin saw the paper towels and described them as "kind of pink-tinged like blood-body fluid mixture but it was dried." She said that the blood was smeared and that the bodily fluid looked like semen. Martin put the plastic bag in her car and returned to the ER. She did not open the diapers.

- 7 -

Martin testified that when she and the victim's mother met with the ER doctor, the victim's mother told him that they were there due to "[c]onstipation, a recent med change from Miralax to Benefiber and some blood in [the victim's] stool." All Martin knew was what Hodges had told her, but the victim's mother's statement to the doctor was inconsistent with Hodges's version. Martin said that constipation was "not a big concern" in her care of the victim and that "I don't recall ever seeing her have a really hard bowel movement." However, Martin had seen the victim have difficulty passing formed stool. Martin had never seen blood in the victim's stool or anal fissures on the victim. The victim took Miralax and Benefiber for constipation and had been switched from one to the other. When the switch occurred, Martin did not notice any changes in the victim's bowel movements.

Martin testified that when the victim's mother took off the victim's diaper for the ER doctor, Martin saw "a very small amount of red, I'm assuming was blood and there was some brownish-yellowy spots on her diaper that looked almost like liquid stool and a little bit of slime." She said that the doctor looked at the victim's "bottom" as if he was changing her diaper, "holding the legs up just kind of glancing." He did not look closely at the victim's rectum. The victim also had an abdominal x-ray. The doctor told them that the victim had a small amount of stool in her upper intestinal tract and to continue with the victim's fiber regimen at home. After the victim was discharged from the hospital, Martin drove everyone home. The victim was exhausted, and Martin got her ready for bed. Meanwhile, the victim's mother changed the victim's bed linens because "[t]here was little droplets of blood in a few places and there was some smeared stool on the sheet and the body pillow." The victim was wearing only a shirt, and Martin changed her into her bed clothes. Martin said she thought the shirt was put into the laundry basket.

Martin testified that the white plastic bag containing the diapers and paper towels had been in the backseat of her car and that "I know that [the victim's mother] took them out of my vehicle but I don't know where they went past that." The next morning, Martin stopped by CareAll to turn in some paperwork. Hodges was there and "kind of distraught about everything that [had] happened." Hodges was upset because she thought nothing had been done about the situation and talked about going to the sheriff's department. Later that day, Martin met Hodges there, and they spoke with Investigator Kelly Carter.

On cross-examination, Martin testified that she did not work with the victim after November 22 because the victim's mother telephoned CareAll and asked that she not return. She said that when she and Hodges went outside at the hospital, Hodges first showed her the items in the white plastic bag and then explained what had happened. Hodges asked for Martin's opinion about the bodily fluid on the paper towels, and Martin thought the fluid was semen. Martin said she had seen semen previously and was basing her opinion on personal and professional experience. Hodges also thought the fluid was semen. Martin acknowledged that Hodges was concerned the [petitioner] had perpetrated some act on the victim. Martin said she did not reveal Hodges's concern to the ER staff because she did not have any first-hand knowledge "other than seeing the paper towels." Also, Hodges had agreed to call the ER and "give them a report on what had happened under her watch." Martin was present when the ER doctor stated his findings, and Martin was concerned that the doctor's findings were not consistent with what had actually happened. Nevertheless, Martin did not say anything to the doctor. The next day, Hodges and Martin met with Investigator Carter together but wrote their statements separately.

On redirect examination, Martin testified that she saw the victim's rectal area when the ER doctor raised the victim's legs and that "you could see a tear below her rectum maybe that size. You could see it running down from her rectum." Martin demonstrated the length of the tear for the jury and acknowledged that it was about one inch. She did not examine the victim's rectal area when they returned home on November 22. Martin said she changed the victim's diaper but "didn't go any further than rinsing her with water because she was obviously in pain."

Investigator Kelly Carter of the Warren County Sheriff's Department testified that he learned about the case on November 23, 2011, and spoke with Sethly Hodges and Tracy Martin. He acknowledged that they gave statements to him that were consistent with their trial testimony. Alicia Cantrell from the Department of Children's Services (DCS) was assigned to the case, and she and Investigator Carter went to the victim's home on the afternoon of November 23. The victim, the victim's parents, the victim's half-brother, and a home health nurse were there. The victim's mother took Investigator Carter and Cantrell into the victim's bedroom, and they viewed the victim.

Investigator Carter testified that he had learned from Hodges and Martin that the victim's light blue shirt and pink shorts were in a diaper bag hanging in the victim's closet and that a white spot was on the clothing. Investigator Carter asked the victim's mother for permission to search the home, and she consented. Investigator Carter said he found the clothes where the nurses had said and that he saw a white spot, "like a dropping," on the shorts. The victim's mother allowed him to take the clothing. That night, Investigator Carter learned that the victim and someone from DCS were at the hospital. Investigator Carter went there and spoke with the victim's mother. The [petitioner] was not present. The victim's mother told Investigator Carter that she and the nurse had gone to the Dollar General Store the previous day and were away from the victim about forty-five minutes. Investigator Carter questioned the victim's mother about the time and then confronted her with Hodges's claim that they had been gone four hours. The victim's mother admitted to the time and said that the victim was left in the [petitioner's] care. She told the officer that she had lied because she did not want to get Hodges in trouble.

Investigator Carter testified that on November 28, he returned to the victim's home and spoke with the victim's mother again. Investigator Carter had learned that a dark blue body pillow cover was folded in the bottom of the victim's hamper in her bedroom. He asked the victim's mother for consent to search, and she said yes. Investigator Carter found the pillow cover and collected it as evidence. On December 1, 2011, Investigator Carter spoke with the [petitioner] at the [petitioner's] mother's home. He did not give *Miranda* warnings to the [petitioner] because he had no reason to arrest the [petitioner] and was "just basically going to talk to him to see what he knew about the incident." He wrote the [petitioner's] statement, the [petitioner] reviewed it, and the [petitioner] signed it. In the statement, the [petitioner] said the following: On November 22, 2011, the [petitioner] stayed home with the victim and heard her "beeper monitor go off," so he went in her room to check on her. The victim had had a hard bowel movement. The [petitioner] did not see anything wrong, and the bowel movement did not have blood on it. The [petitioner] changed the victim's diaper and lay down on the floor in her room. He texted the victim's mother, telling her about the bowel movement and that the victim's "butt looked raw so I put cream on it." About twenty minutes before the victim's mother came home, the [petitioner] changed another diaper that contained "some hard and some soft poop." He did not see blood in the diaper, put the diaper in the trash, and took out the trash. The [petitioner] used paper towels instead of baby wipes to wipe the victim. He

- 10 -

was lying on the floor when the victim's mother got home. The [petitioner] told Hodges about what had happened and went to smoke. Hodges called the victim's mother into the victim's bedroom, and the victim's mother yelled at the [petitioner], "'[W]hat the [f* * *] did you do, Joe?' "The [petitioner] did not tell her anything. The victim's mother said the victim was bleeding, so they all left for the hospital. Tracy Martin arrived at the hospital and drove the [petitioner] to work.

Investigator Carter testified that after the [petitioner] gave his statement, the [petitioner] asked about the victim's clothes. Investigator Carter told the [petitioner] that he had not yet sent the clothes to the Tennessee Bureau of Investigation (TBI). The [petitioner] stated, "I sometimes masturbate." Investigator Carter asked if the [petitioner] did so in the victim's room, and the [petitioner] said no. The [petitioner] said that he sometimes used his clothes to clean himself but that he did not use the victim's clothes. Investigator Carter wrote the [petitioner's] masturbation statement in his notes but did not put it in the [petitioner's] written statement. On February 6, 2012, Investigator Carter asked the [petitioner] to provide a DNA sample. He collected buccal swabs from the [petitioner] and the victim and sent all of the evidence to the TBI Crime Laboratory. Later, he learned that semen had been found on the victim's shorts. On April 20, 2012, Investigator Carter went to the [petitioner's] home and asked him for an interview at the sheriff's department. The [petitioner] did not have a ride, so he rode to the sheriff's department with Investigator Carter. Although the [petitioner] was not under arrest, he received *Miranda* warnings and spoke with Investigator Carter and Investigator Jason Rowland. Investigator Carter said that Investigator Rowland "mainly" questioned the [petitioner]. During the interview, which was recorded, the [petitioner] stated that he never saw blood in the victim's diaper and that he wiped the victim with a paper towel because the perfumes in baby wipes could burn the victim. Investigator Carter questioned the [petitioner] about the semen, and the [petitioner] could not explain how the semen got onto the victim's shorts. Investigator Carter said the [petitioner] stated that the semen should not have been there and that he had not masturbated that day. On cross-examination, Investigator Carter acknowledged that after speaking with Hodges and Martin on November 23, he was concerned about a sexual assault. He and Alicia Cantrell went to the victim's home to conduct a welfare check on her. The [petitioner] answered the door, and Cantrell told him that they needed to speak with the victim's mother. Cantrell told the victim's mother that they were there for a welfare check on

the victim. Cantrell also advised the victim's parents that she and Investigator Carter were there "looking into some allegations."

Investigator Carter testified that when he returned to the home on November 28, he had the victim's mother sign a consent to search form. He did not have her sign a consent to search form on November 23 when he collected the shirt and shorts. Investigator Carter said that throughout his investigation, the [petitioner] was "[s]omewhat" cooperative and always maintained that he did not do anything to the victim. However, Investigator Carter said that the statements the [petitioner] made after his written statement on December 1 "kind of raised my suspicions a lot more on him." Investigator Carter acknowledged that those statements were not part of the [petitioner]'s written statement. He also acknowledged that when he asked the [petitioner] during the April 20 interview if the [petitioner] had masturbated on November 22, the [petitioner] may have said that he probably did. Investigator Carter knew when he and Investigator Rowland interviewed the [petitioner] that semen had been found on the victim's shorts but did not know the semen belonged to the [petitioner]. He denied leading the [petitioner] to believe it was the [petitioner]'s semen, stating, "Investigator Rowland is the one who basically asked the questions." Investigator Carter acknowledged that the [petitioner] continually stated that he did not know how the semen got on the victim's shorts.

Investigator Carter testified that at some point, DCS advised him that two doctors from the hospital ER had examined the victim on two separate occasions and that both had concluded the victim's rectal tear was the result of a hard bowel movement. He also received information about the case from the Our Kids Center and DCS reports. Investigator Carter did not interview the doctors or anyone from Our Kids and did not review any medical records. He denied that DCS, not the sheriff's department, "spearheaded" the case.

Dr. Laura Boos of the TBI Crime Laboratory's Serology DNA Unit testified that she received the victim's shirt and shorts, a blue pillowcase, and the [petitioner's] and the victim's buccal swabs. She tested the clothing for semen and the pillowcase for blood and semen. Dr. Boos found semen on the victim's shorts and compared the DNA from the semen to the DNA from the buccal swabs. The DNA from the semen matched that of the [petitioner]. She said that the probability of a person unrelated to the [petitioner] having his same DNA profile exceeded the world's current population of almost six billion people. In other words, "one would

not expect to find that same profile from anyone else in the world statistically." On cross-examination, Dr. Boos testified that she could not determine how long the semen had been on the shorts or how it got there.

Lori Littrell, a physician's assistant at the Our Kids Center in Nashville, testified that she performed a forensic medical examination of the victim on November 23, 2011. The victim was well nourished but unresponsive during the exam, and Littrell noticed that the victim had some limb stiffness and spastic movements throughout the exam. Littrell looked at the victim's vaginal and rectal areas with a colposcope, which magnified the areas. Littrell said that the victim's vaginal exam was normal and that ninety-five percent of all vaginal exams conducted at the Our Kids Center were normal due to the delay in disclosure of abuse and the fact that some children were touched in ways that did not cause any type of physical injury. During the victim's rectal exam, Littrell noticed fissures, which she described as "really small . . . superficial cuts that are fairly common in the anal area." The victim's fissures initially appeared to be "pretty insignificant." However, when Littrell used her hands to separate the victim's "butt cheeks," she saw that the victim had two anal "tears." Littrell said that she considered a tear to be more extensive than a fissure. Looking at the victim's anal area like a clock, Littrell saw a "pretty extensive tear" at the 6:00 position. The victim also had a tear at the 11:00 position. The victim had fissures at the 3:00, 5:00, and 8:00 positions. Littrell identified photographs of the tears and fissures for the jury.

Littrell testified that fissures were common for a person with a history of constipation. However, the victim's tears were abnormal, and Littrell concluded that her findings were "more excessive or extensive than what would be expected with the passing of a large stool or constipation and thereby raised serious concerns about the possibility of sexual abuse." If Littrell had been in the ER with the victim on November 22 and 23, she would have disagreed with the ER doctors' diagnoses. She said that sperm on the victim's clothing and the victim's rectal bleeding made her even more concerned about sexual abuse. She said that in cases of constipation, a child would have blood in the stool or diaper at the time of the bowel movement.

On cross-examination, Littrell testified that Alicia Cantrell had referred the victim to the Our Kids Center and acknowledged that Cantrell had been concerned about a sexual assault. Littrell also acknowledged that the victim had been examined on two prior occasions, once on November

22 and once on November 23, and that the victim had been diagnosed with fissures caused by constipation. Cantrell sent the victim to Our Kids because she disagreed with those diagnoses. Littrell acknowledged that if the two ER physicians had conducted digital examinations of the victim's rectum, those exams could have exacerbated the victim's fissures. Littrell examined the victim "after hours" on November 23 but could not remember the exact time of the examination. Littrell said that Our Kids employees did not diagnose children with sexual abuse; instead, "[w]e give our impressions as far as we're concerned about the possibility." Littrell said she was "very concerned [about] penetrating trauma" in the victim's case. She said she had examined 500 to 600 children and had "never seen a history of constipation with this type of injury." At the conclusion of Littrell's testimony, the State rested its case.

The victim's mother testified that she and the [petitioner] "were together" four years and that the [petitioner] was the victim's father. In November 2011, the victim received twenty four-hour nursing care from four nurses who worked twelve-hour shifts. On November 22, the victim's mother and Sethly Hodges drove to Smyrna in order to pick up the victim's mother's son. The nurses were not supposed to leave the victim. However, the victim's mother had wrecked her car and asked Hodges to drive her to Smyrna. The victim's mother stated that while she and Hodges were on the trip, the [petitioner] texted that the victim had had a large bowel movement, that he had changed the victim's diaper, and that he had put ointment on her "butt." The [petitioner] also advised the victim's mother that she needed to give the victim more water to make sure the victim's stool was softer. After the victim's mother and Hodges left Smyrna, they went to a pharmacy to get pills for Hodges's boyfriend and took the pills to him.

The victim's mother testified that the [petitioner] was asleep on the floor when she returned home and that she had to wake him. She said she was "chewing his butt" because he had forgotten to feed the victim. While they were outside arguing, Hodges began changing the victim's diaper. Hodges yelled for the victim's mother, and the victim's mother went into the victim's bedroom. Hodges showed the victim's mother a baby wipe and asked if blood was on the wipe. The victim's mother looked at the wipe and answered, "[L]ooks like it but could be poop." The victim's mother used another wipe to wipe the victim, saw a small amount of blood on the wipe, and began arguing with the [petitioner] again. She got the diaper that the [petitioner] had changed out of the trash, and they all went to

- 14 -

the hospital. The victim's mother took the diaper to the hospital so she could show it to the doctor.

The victim's mother testified that when they arrived at the hospital, she did not take the bag containing the diaper inside because she did not want to carry a trash bag into the hospital. She told the ER staff that the victim was bleeding, that the victim's father had changed her diaper, and that the diaper "had a big poop in it." The ER doctor diagnosed the victim with anal fissures due to constipation. The victim's mother said she was not concerned about anything else because the hospital staff "didn't say anything otherwise." The next day, a DCS employee and a police investigator arrived at the family's home. They asked questions, asked to look through the home, and asked that the victim return to the hospital. The victim's mother took the victim back to the ER, and another ER doctor diagnosed the victim with anal fissures due to constipation. The victim's mother said that she did not mislead the hospital staff on November 22 or 23 and that, during the visit on November 23, "I didn't hardly talk to the doctors at all. . . . They already knew we was coming because I guess Alicia [Cantrell] had already called them and told them we were going to be down there. I didn't have to explain anything to them."

The victim's mother testified that after they left the hospital on November 23, she took the victim to the Our Kids Center in Nashville. They arrived about 1:00 a.m. on November 24. After the [petitioner] was arrested, Investigator Carter told the victim's mother that semen had been found on the victim's shorts. The victim's mother said she told the investigator that she was "bothered" by that revelation and that she "didn't think that it could happen."

On cross-examination, the victim's mother testified that the [petitioner] did not spend much time with the victim and only took care of her when other people were not there to do it. The victim's mother thought the victim would be safe with the [petitioner] on November 22. She and Hodges left for Smyrna about 12:45 p.m., and the [petitioner] texted her about 2:00 p.m. The text did not mention blood. The victim's mother and Hodges returned home about 5:00 p.m. The victim's mother said that she had to wake the [petitioner] and that he slept on the floor of the victim's room when he had to take care of the victim because "her alarm goes off and you have to go in there . . . so he would just stay in there with her." When the victim's mother went into the victim's room that afternoon, she did not smell anything. Hodges took off the victim's diaper, and the diaper

- 15 -

was clean. The victim's mother said that she yelled at the [petitioner] because a small amount of blood was on the baby wipe and the victim had been hurt in the [petitioner's] care. She stated that the victim had problems with bowel movements and that she thought the [petitioner] "might have like kept [the victim's] legs up to help her push hard bowels out." She said she told the [petitioner] that if he had hurt the victim, she would kill him.

The victim's mother testified that Hodges pointed out that the [petitioner] had emptied the trash can in the victim's room. The victim's mother said that the [petitioner] usually did not take out the trash in the middle of the day and that the trash usually was emptied at the end of every nurses's shift. The victim's mother and the [petitioner] retrieved two dirty diapers from the emptied trash. One of the diapers had stool in it, and the other had urine in it. The victim's mother and the [petitioner] also retrieved two or three baby wipes and some paper towels out of the trash. Blood was on one of the baby wipes, and blood and stool were on the paper towels.

The victim's mother said the [petitioner] told her that the victim's "butt was raw and he didn't want to burn her butt using the baby wipes so he wiped with the paper towel." Hodges also pointed out to the victim's mother that red or brown stains were on the victim's pillowcase. The victim's mother did not see stains on the victim's shorts. The State asked the victim's mother if she had "spread [the victim] open" to look at the victim's rectum as Hodges had testified, and the victim's mother answered, "No. I [held] her legs up." She denied telling anyone from law enforcement that she spread the victim's legs apart to inspect the victim's rectum.

The victim's mother acknowledged that when she took the victim to the ER on November 22, the victim was bleeding only slightly. However, she said, "I take her to the ER [any time anything] happens." She said she told the ER doctor that blood and "poop" were in the victim's diaper. When the State reminded the victim's mother that she had testified that no blood was in either diaper retrieved from the trash, she stated that blood was on one of the baby wipes and that the wipe was in the diaper containing stool. She acknowledged that she did not show the dirty diaper to the ER doctor but said that she told him about the diaper and that it was in the car if he wanted to see it. The ER doctor inserted his finger into the victim's rectum during the examination. When the victim's mother got home that night, she put the plastic bag containing the two dirty diapers and paper towels back into the trash. The next day, the [petitioner's] father

- 16 -

"took it off" before Alicia Cantrell and Investigator Carter arrived. The victim's mother said she lied about where she was on November 22 because she did not want Hodges to get in trouble. However, when Hodges told the truth about the trip, the victim's mother "looked like the idiot." She acknowledged that she had been involved with DCS previously and that Hodges did not have a reason to lie. The victim's mother stated that "[w]henever I fire a nurse they usually call DCS on me" and that she disliked how DCS "treat[ed] people." The victim's mother said that when Hodges did not show up for work as scheduled on November 23, she told the [petitioner] that DCS would be "knocking on the door either today or tomorrow."

Dr. Nigel Fontenot testified that he was an ER physician at River Park Hospital and examined the victim on November 23, 2011. The victim had been examined by another doctor previously and returned to the ER for another determination as to whether she had physical signs of abuse, specifically anal trauma. Dr. Fontenot said he was aware prior to the exam about possible sexual abuse and examined the victim's vaginal and anal areas. For the anal exam, Dr. Fontenot pulled apart the folds of the victim's buttocks to look at the tissue in the anal opening. He said that he did not see any bruising or irritation to the tissue but saw a "tiny, tiny" fissure at the 6:00 position. He said the fissure was "maybe just a few millimeters in size." Dr. Fontenot did not see any active bleeding. He acknowledged that he had examined children for sexual abuse previously and said that he could not recall any case in which he had seen evidence of sodomy. He had seen, however, evidence of vaginal rape. He stated that in the instant case, he did not see "anything that stood out as signs that there was a forcible assault."

On cross-examination, Dr. Fontenot testified that he did not use a colposcope or external light source during the victim's rectal examination. He conducted an external, visual exam and saw one fissure. He did not conduct an internal exam. Therefore, he would not have been surprised to learn that someone who conducted an internal exam saw an internal fissure. However, he would have been surprised to learn that someone who conducted an external exam saw more than one external fissure. He stated that an extremely handicapped child such as the victim, who was unable to resist a perpetrator, would experience less physical trauma during a sexual assault than a child capable of resisting and that he would expect to see "minimal external evidence of trauma." In fact, the passage of an extremely large, hard stool could cause more trauma to the child than a

- 17 -

penile penetration. Dr. Fontenot had been advised that the victim had experienced an unusually large bowel movement, and he relied on that statement for his diagnosis. Therefore, in his opinion, it was reasonable to assume that the victim's fissure had been caused by constipation. He acknowledged that if he had known semen was present on the victim's clothing, he would have looked at the cause of the fissure differently.

At the conclusion of Dr. Fontenot's testimony, the jury convicted the [petitioner] as charged of aggravated rape of a child, a Class A felony. After a sentencing hearing, the trial court sentenced him to fifty-eight years in confinement to be served at 100%.

*Id.*, at *1-13.

The petitioner subsequently moved for a new trial, and the trial court denied the request. A timely direct appeal followed. On direct appeal, the petitioner claimed the trial court erred by denying his motion to suppress Littrell's testimony and the Our Kids report because the DCS worker who accompanied the victim to the examination improperly revealed to employees of Our Kids that the petitioner had a prior juvenile adjudication for a sex offense. *Id.* at *13. The petitioner argued the DCS worker obtained the information regarding the juvenile conviction in violation of Tennessee Code Annotated section 37-1-153. *Id.* The Court of Criminal Appeals noted the petitioner failed to call the DCS worker at the suppression hearing, so it could not determine whether the information had been wrongfully obtained. *Id.* Moreover, the petitioner failed to call Littrell at the suppression hearing, so it could not determine what, if any, prejudicial effect the information had on her. *Id.* This Court additionally found the evidence presented at trial to be sufficient to sustain his conviction, and therefore affirmed the judgment of the trial court. *Id.*

The petitioner next filed a timely petition for post-conviction relief alleging ineffective assistance of counsel. The post-conviction court appointed counsel, and the petitioner filed an amended petition for post-conviction relief arguing trial counsel provided ineffective assistance when failing to call both treating ER physicians to testify at trial and failing to seek an independent medical expert. The petitioner then sought permission to file another amended petition for post-conviction relief, and the post-conviction court allowed the amendment.

- 18 -

In his second amended petition for post-conviction relief,[1] the petitioner asserted the following additional grounds for his ineffective assistance of counsel claim: failure to call Littrell to testify at the suppression hearing regarding the bias created by the reference to the petitioner's juvenile record; failure to object to Littrell's testimony regarding the opinions held by other medical practitioners in her office; failure to seek suppression of the petitioner's refusal to submit to a polygraph test and/or failure to object when Carter offered testimony regarding the petitioner's refusal at trial; failure to adequately prepare Dr. Fontenot to testify at trial and/or failure to rehabilitate Dr. Fontenot after he changed his opinion regarding whether sexual abuse caused the victim's injuries; failure to question Dr. Fontenot regarding the opinions held by Littrell; failure to test the rape kit; failure to question Hodges about picking up narcotics from the pharmacy and delivering them to her boyfriend during the time of injury; failure to ask the victim's mother whether Hodges had narcotics in her possession the day of the rape and/or whether Hodges was under the influence of narcotics the day of the rape; failure to call Dr. Logan, the first emergency room physician to examine the victim, as a witness at trial; failure to admit Dr. Logan's medical records for the victim into evidence; failure to object to the admission of the victim's shorts into evidence; failure to effectively cross examine Dr. Boos; and failure to effectively cross-examine the victim's mother.

The post-conviction court held a hearing on the request for post-conviction relief and heard testimony from Littrell, trial counsel, and the petitioner. Littrell, a physician's assistant at the Our Kids Center in Nashville, testified she was on-call November 23, 2011, when the victim was taken to the clinic due to concerns of sexual abuse. The victim's mother told Littrell about the victim's anal tears, and Littrell was also told the petitioner had a history of juvenile sexual abuse and had been left alone with the victim. Prior to evaluating the victim, Littrell learned she had already been evaluated by two emergency room physicians who opined the anal tears were the result of constipation. Based on her examination, experience, and the relevant literature, Littrell instead opined the anal tears were the result of sexual abuse. She then collected evidence, known as the "rape kit," and this evidence was stored at Our Kids. Littrell did not know whether law enforcement ever collected the rape kit for testing.

Trial counsel testified next. Trial counsel has been a licensed Tennessee attorney since 2005. From 2005 to 2011, trial counsel served as an assistant district attorney in Warren County. Since entering private practice, trial counsel has focused on criminal defense work. Trial counsel testified that he has tried numerous jury cases as both an assistant district attorney and a criminal defense attorney.

---

[1] The petitioner titled the document "Third Amended Petition for Post-Conviction Relief," but our review of the record indicates it was actually the second amended petition.

Trial counsel did not seek permission to obtain a medical expert to assist with the case because he did not think it was necessary. Trial counsel did, however, seek and receive permission to obtain an investigator. The investigator hired by trial counsel spent 67.3 hours on the matter and travelled 810 miles.

Trial counsel was aware law enforcement never tested the rape kit collected by Littrell. When questioned during the post-conviction proceeding regarding the rape kit, trial counsel testified he did not submit the kit for testing because resources were limited, and he did not want to put too much money into something that may not advance his client's cause. Trial counsel conceded that in hindsight he may have proceeded differently. At the time, however, he did not think the petitioner would benefit from testing the evidence collected during the physical examination of the victim for the presence of the petitioner's semen.

As part of his investigation, trial counsel's investigator attempted to contact Hodges so on three occasions. Each time the investigator knocked on the door of Hodges' last known address but did not receive an answer. He eventually left a business card requesting a return call. Hodges never called.

Trial counsel's investigator also contacted the victim's mother, who initially refused to cooperate. Prior to trial, however, the victim's mother reached out to the investigator and scheduled a meeting. During their meeting, the victim's mother indicated that the day of the rape, she and Hodges left the victim alone with the petitioner while they went to a pharmacy, picked up narcotics, and took them to Hodges' boyfriend's house. While there, Hodges went inside for thirty-five to forty-five minutes while the victim's mother remained in the car. The investigator subsequently served the victim's mother with a trial subpoena and again received a hostile response. The victim's mother appeared at trial, though, and offered testimony consistent with the information she provided to the investigator.

Based on the pretrial conversation with the victim's mother, trial counsel stated he did not question Hodges about picking up and/or delivering narcotics the day of the rape because he assumed she would deny it. Also, the petitioner told trial counsel that on several occasions he ingested drugs with the nurses who cared for the petitioner, and trial counsel was afraid Hodges would tell the jury this if questioned about picking up the drugs while she was supposed to be caring for the victim. Instead, trial counsel opted to get this information into evidence through the victim's mother.

Trial counsel testified at length regarding the efforts made to find Dr. Logan, the first physician to evaluate the victim at the ER. The investigator hired by trial counsel attempted to contact Dr. Logan at the hospital where the victim was treated, but the

physician no longer did rotations at the hospital. Dr. Logan's office in Henderson, Tennessee had closed, so the investigator could not contact him at that address. The investigator then left a voicemail message at the phone number associated with the Henderson, Tennessee office address but did not receive a return call. The investigator located another office address for Dr. Logan in Lawrenceburg, Tennessee, but Dr. Logan no longer worked in that office. The investigator then located an address for Dr. Logan in Tampa, Florida, but the telephone number associated with the address went to a locksmith. The investigator contacted a hospital in Tampa where Dr. Logan had privileges but was told the physician had not practiced there in years. The investigator then found two additional addresses associated with Dr. Logan and left messages for him at both but did not receive return calls.

After the attempts to locate Dr. Logan proved unfruitful, trial counsel took the position that Dr. Logan's examination could come into evidence through Dr. Fontenot, who examined the victim after Dr. Logan. Both trial counsel's investigator and trial counsel spoke with Dr. Fontenot prior to trial. At the time he treated the victim, Dr. Fontenot was aware there were concerns of sexual abuse and was aware Dr. Logan had previously examined the victim and opined the anal fissures were caused by the passage of a large bowel movement. Trial counsel admitted Dr. Logan's medical records were not exhibited at trial but could not remember his reason for not introducing them into evidence. Trial counsel likewise could not remember whether he told Dr. Logan about the semen stain on the victim's shorts. He disagreed Dr. Logan changed his opinion at trial after learning of the semen stain found on the victim's shorts and instead remembered Dr. Logan stating it would have been important to know about the semen stain at the time he treated the victim.

Trial counsel admittedly did not file a motion to suppress evidence regarding the petitioner's refusal to take a polygraph test. During cross-examination by trial counsel at trial, Investigator Carter referenced the petitioner's refusal to take a polygraph test. Rather than object, ask for a limiting instruction, or move for a mistrial, trial counsel elected not to draw attention to Investigator Carter's comment and instead continued questioning the witness.

When testifying at trial, Littrell indicated she spoke with several coworkers that agreed with her diagnosis. Trial counsel did not object to this hearsay testimony or cross-examine Littrell regarding the names and qualifications of those coworkers because once Littrell revealed that information at trial, it was too late for those witnesses to be located and called to testify. Moreover, questioning Littrell about her decision to speak with her coworkers would not have changed her actions and opinions. Instead, it would have highlighted Littrell's testimony that others in her office agreed with her opinions.

When the State moved to introduce the semen-stained shorts at trial, trial counsel did not object to their admissibility. Trial counsel received all evidence prior to trial and knew the shorts had been properly preserved. He did not object to any deficiencies in the chain-of-custody testimony because he believed they could be cured. Trial counsel stated it was always his belief the victim was wearing the shorts the day of the rape. He discussed all evidence with the petitioner prior to trial, including the shorts. The petitioner saw the shorts and never voiced concern they were not the shorts his daughter was wearing the day at issue. Further, trial counsel understood that Hodges told Investigator Carter those were the shorts the victim was wearing the day of the rape, and Investigator Carter then located the shorts using the information Hodges provided to him.

The petitioner testified last at the post-conviction hearing. The petitioner stated he did not testify at trial because he was scared he would be questioned regarding his juvenile conviction. Had he known the conviction could not be used against him unless he opened a door to its use through his testimony, he would have testified at trial. The petitioner denied sexually assaulting his daughter.

The petitioner rested after calling Littrell, trial counsel, and the petitioner to testify. The State did not present any additional proof. The post-conviction court denied the petition, and in its order denying the petition found:

1. Counsel was not deficient by failing to call Lori Littrell to testify at the suppression hearing. There is no reason to believe her testimony could have been excluded even if she had testified.

2. [Trial] [c]ounsel was not deficient by failing to object to the question regarding Ms. Littrell's colleagues['] opinions being consistent with her findings. Although the answer was possibly hearsay counsel reasonably chose to not highlight that part of the answer by objecting and drawing attention to it.

3. Similarly, [trial] counsel did not object to the answer given by Investigator Carter that referenced in passing a polygraph request of the [petitioner]. [Trial] [c]ounsel believed at the time the jury did not seem interested in that part of the answer and therefore chose not to highlight it by objecting even though the statement was inadmissible.

4. [Trial] [c]ounsel spoke to Dr. Fonetnot before trial and was not deficient in preparing the doctor for his testimony. [Trial] [c]ounsel did his best to get Dr. Fontenot to give testimony favorable to his client.

5. There was no deficiency in any other questioning or lack thereof in Dr. Fontenot's testimony.

6. [Trial] [c]ounsel should have investigated the results of the rape kit. However, there is no evidence of what the results of that test were so there is no belief that a lost rape kit would have changed the verdict without pure speculation.

7. The allegation that [trial] counsel did not properly cross-examine Sethly Hodges is without merit. [Trial] [c]ounsel did thoroughly question Hodges, and his explanation of why he did not ask certain questions of Hodges made perfect sense. [Trial] [c]ounsel had a legitimate strategy in his decision.

8. [Trial] [c]ounsel tried repeatedly to contact Dr. Logan [and] was unable to do so. Failure to call a witness when you are unable to ascertain what that witness' response will be is not deficient performance.

9. The testimony of Investigator Carter was not objectionable with regard to the clothing he recovered. [Trial] [c]ounsel's failure to cross-examine Sethly Hodges and Tracy Martin cannot be considered to be deficient as there is no proof in the record as to what they would have said when pushed about the clothes the victim was wearing. The failure to object to the District Attorney's characterization that the clothes were the ones worn by the victim is questionable, however, not so damning as to affect the verdict.

10. There is no evidence that Dr. Boos['] testimony would change had other questions been asked of her. No testimony was presented by her at the post-conviction hearing.

11. There is no evidence that Kristian Boyd would have testified as [petitioner's] post-conviction counsel suggests in their motion. Further, trial counsel's investigator properly talked to Boyd before trial and trial counsel was as prepared as he could be for her testimony.

12. There is ample evidence that [the petitioner] made a knowing, intelligent, and voluntary waiver of his right to testify. This allegation is wholly without merit. The [petitioner] was advised repeatedly regarding the advantages and disadvantages of testifying. He was also properly questioned by the Court on this issue as well. The

[petitioner's] statements indicate that he was very aware of his decision at the time [and] would now like to change his mind because of the outcome. [The petitioner] was not misinformed with regard to what may or may not be asked of him on the witness stand.

This timely appeal followed.

## *Analysis*

On appeal, the petitioner argues trial counsel provided ineffective assistance by failing to: object to Investigator Carter's testimony regarding the petitioner's refusal to take a polygraph test; object to the hearsay testimony of Littrell regarding opinions by unnamed coworkers; introduce the medical records of Dr. Logan; mention the untested rape kit; question Hodges regarding her possession or use of drugs prior to reporting the sexual assault; object to the admission of shorts belonging to the victim with the petitioner's semen on them; object to the State's characterization of the shorts during closing statements as the shorts worn by the victim the day of the assault; and adequately prepare Dr. Fontenot for trial. According to the petitioner, these cumulative errors caused prejudice by substantially impairing the ability of the jury to accurately weigh and assess the proof. The State contends the petitioner failed to show how trial counsel's performance was deficient and instead challenges the strategic decisions of trial counsel made after adequate trial preparation. We agree with the State and affirm the judgment of the post-conviction court.

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The post-conviction petitioner bears the burden of proving his allegations of fact by clear and convincing evidence. *See* Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter "'entrusted to the trial judge as the trier of fact.'" *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. *See Tidwell v. State*, 922 S.W.2d

497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001); *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution both require that criminal defendants receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citation omitted). When a petitioner claims he received ineffective assistance of counsel, he has the burden of showing trial counsel's performance was deficient and this deficient performance prejudiced the outcome of the proceeding. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). With regard to the standard, our Supreme Court has held:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer

with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter*, 523 S.W.2d at 934-35).

When reviewing trial counsel's performance, this Court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). The fact a trial strategy or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.*

To satisfy the prejudice prong of the test, the petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). In order for the petitioner to prevail, the deficient performance must have been of such magnitude that the petitioner was deprived of a fair trial and the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316.

Courts need not approach the *Strickland* test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; *see also Goad*, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish:

that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness injured to his prejudice, or (d) the failure to have a known witness

present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

*Id.*

Here, the petitioner challenges a string of tactical decisions made by trial counsel during the course of representation after adequate trial preparation. Trial counsel's investigator spent 67.3 hours on this case and spoke with multiple witnesses. In addition, trial counsel spoke with Dr. Fontenot, met with the petitioner, and reviewed all evidence with the petitioner prior to trial. Based on our review of the record, trial counsel was adequately prepared for the case.

During the post-conviction hearing, trial counsel offered explanations for each tactical decision challenged by the petitioner. With respect to Investigator Carter's testimony regarding the petitioner's refusal to take a polygraph test, trial counsel explained Investigator Carter unexpectedly offered this information on cross-examination. Rather than cease his questioning of the witness and object or ask the trial judge for a mistrial or limiting instruction, trial counsel decided not to draw attention to the statement and instead continued with his cross-examination of the witness. Similarly, when Littrell indicated she spoke with her coworkers regarding the victim and they agreed with her diagnosis, trial counsel did not object to this hearsay testimony or cross-examine Littrell regarding the identity and credentials of the coworkers she spoke with. Again, trial counsel stated he did not wish to draw attention to the fact others agreed with Littrell's finding the anal fissures were the result of sexual abuse.

When questioned during the post-conviction proceeding regarding the rape kit, trial counsel testified he did not ask for the kit to be tested because funds were limited, and he did not think that would be the best use of resources. Trial counsel also did not think testing the rape kit would advance the petitioner's cause. While trial counsel admitted in hindsight he may have preceded differently with respect to the rape kit, the petitioner is not entitled to the benefit of hindsight. *Howell*, 185 S.W. 3d at 326. Trial counsel was not questioned regarding why he did not question witnesses regarding the reason the evidence collected by Our Kids remained untested, and on appeal we cannot speculate as to the reason trial counsel did not do so.

With respect to Dr. Logan, trial counsel recounted the extensive measures taken by his investigator to locate the physician. He tried at least six different addresses in two different states, left multiple voicemail messages, and never received a response. Trial counsel conceded Dr. Logan's medical records were not entered as evidence at trial. Trial counsel could not remember the reason for the omission but clarified his position at trial had been that Dr. Fontenot, who did testify, reviewed Dr. Logan's medical records

- 27 -

when treating the victim, so Dr. Fontenot could testify as to Dr. Logan's medical diagnosis.

Trial counsel testified at length during the post-conviction hearing regarding his tactical reasons for not questioning Hodges about her possession or use of drugs prior to reporting the rape. Trial counsel did not think Hodges would admit to the delivery and potential ingestion of drugs and instead hoped to get this information into evidence through the victim's mother. Moreover, the petitioner previously told trial counsel he had taken drugs with many of the home healthcare nurses who visited his home to care for the victim, and trial counsel did not want to ask Hodges questions that may result in the jury hearing this information.

The petitioner challenges trial counsel's failure to object to the introduction into evidence of the victim's shorts bearing the petitioner's semen. Similarly, the petitioner challenges trial counsel's failure to object to the comment made by the State during closing arguments regarding the shorts being worn by the victim the day of the rape. When questioned about this during the post-conviction hearing, trial counsel stated he did not object to the chain-of-custody because, based on the information regarding the shorts he received prior to trial, he believed the State could correct any custody errors. Further, he reviewed the evidence with the petitioner prior to trial, and the admissibility of the shorts was never an issue. The petitioner saw the shorts and did not voice concern his daughter was not wearing them the day at issue. It was also trial counsel's belief that Hodges told Investigator Carter those were the shorts the victim was wearing the day of the rape, and Investigator Carter then located the shorts using the information Hodges provided to him.

Lastly, the petitioner alleges trial counsel did not adequately prepare Dr. Fontenot for trial by telling him in advance about the semen stain on the victim's shorts. During the post-conviction hearing, however, trial counsel indicated his investigator interviewed Dr. Fontenot, and trial counsel then spoke with Dr. Fontenot via telephone regarding his opinions. Dr. Fontenot knew of the sexual abuse allegations when he treated the victim and knew he was coming to trial because there was an allegation of very violent sexual abuse. Trial counsel could not remember whether he told Dr. Fontenot about the semen stain found on the victim's shorts, but trial counsel remembered discussing the reasons for Dr. Fontenot's opinion the victim's injuries were not the result of sexual abuse prior to trial.

The petitioner failed to offer any evidence at the post-conviction hearing that the challenged actions were anything but tactical decisions made after adequate preparation for trial. The petitioner is not entitled to the benefit of hindsight simply because he is not satisfied with the jury's verdict. Even if there were some procedural oversights by trial

counsel, we have found nothing in the record to indicate the petitioner endured prejudice as a result of the actions of trial counsel.

The petitioner contends the cumulative errors of trial counsel resulted in the denial of a fair trial. We discerned no errors, so this argument is without merit. The petitioner is not entitled to post-conviction relief.

## *Conclusion*

Based on the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
J. ROSS DYER, JUDGE